60 So.2d 9

ARKANSAS LOUISIANA GAS CO. v. SOUTHWEST NATURAL PRODUCTION CO. et al.

No. 40512.

July 3, 1952.

Blanchard, Goldstein, Walker & O'Quin, Robert Roberts, Jr., and George Conger, Shreveport, for Arkansas Louisiana Gas Company et al., plaintiff-appellant.

Simon & Carroll, Barham & Elder, Tucker, Bronson & Martin, Shotwell &

Brown, Monroe and Elmo P. Lee, Jr., Shreveport, for Southwest Natural Production Company et al., defendants-appellees.

FOURNET, Chief Justice.

The Arkansas Louisiana Gas Company, the designated producer and operator of the well drilled in Section 29, T. 19 N., R. 2 W., Lincoln Parish, under the terms of the operating agreement entered into by all of the lease and mineral contract owners for the development of this section, pursuant to Order No. 164 of the Commissioner of Conservation establishing 640-acre units for the exploration of the Bodcaw and Vaughn sand reservoirs in the Ruston Field, instituted this suit under Louisiana's Uniform Declaratory Judgments Act, Act No. 22 of the Extra Session of 1948, now Sections 13:4231–4246 of the LSA–Revised Statutes of 1950, for the purpose of obtaining a judgment settling the dispute existing among the various parties with respect to the basis for calculating the royalties to be paid the mineral and royalty owners.

No factual issue is involved in the case. The sole legal question for our determination is: Are the royalty owners throughout the unit entitled to be paid on the basis of the return from the sale of all gas and distillate produced from the unit, or only on the basis of the amounts realized by their own lessees from the sale of the proportion of the production allocated to the tract in which they have an interest?

The argument advanced by the plaintiff-appellant, the proponent of the former view, is that immediately upon the issuance of the Commissioner's order establishing drilling units of 640 acres for the exploration of the Bodcaw and Vaughn sands in this field, the entire structure of the mineral *ownership* was, as to the lands included in these units, converted, and the rights and obligations of the lessees and lessors under the leases affecting the land within each unit recast, with the result that each and every royalty owner was given a definite interest in every foot of gas and every barrel of distillate produced from the well and not merely in that portion allocated to the tract in which he has an interest, the fact that this changes the contractual rights and obligations of the lessors and lessees under the several leases being of no moment since it was contemplated, when the contracts were entered into, that these rights and obligations would be subject to the superior compulsion of a valid order of the Commissioner, and the possibility that the terms and provisions of the contracts and the rights and obligations of the parties would be thus altered was implied in every contract. To support this contention, reliance is placed on the cases of Placid Oil Co. v. North Central Texas Oil Company, Inc., 206 La. 693, 19 So.2d 616; Hunter Co. v. McHugh, 202 La. 97, 11 So.2d 495; Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10; Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734; Alston v. Southern Production Company, Inc., 207 La. 370, 21 So.2d 383; Crichton v. Lee, 209 La. 561, 25 So. 229; Hunter Co. v. Vaughn, 217 La. 459, 46 So.2d 735; and Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87.

It is the contention of the defendants, on the other hand, that the unitization of the several tracts under lease, pursuant to the valid orders of the Commissioner, has no other effect than to allocate to each tract its pro rata share of the *production* from the entire unit, based on the proportion the acres contained in the individual tract bears to the total number of acres in the unit; consequently, that the lessees of the tracts contained in this unit are obligated to account to their royalty owners only on the basis of the proceeds realized by them from the marketing of the production thus allocated to the tract, and in accordance with the terms of the individual lease contracts existing between the respective lessors and lessees. In this view they were sustained by the trial judge, who rendered judgment in their favor, setting out in detail the procedure for calculating the amount due each royalty acre in the tract.

While it is true that certain language in the cases above cited would seem to lend support to the plaintiff's theory, an examination of these opinions discloses they involved the effect of unitization orders on the contractual rights of the lessor and lessee only in so far as the division, use, or development of the mineral servitude created was concerned, and that the effect of

such orders on the structure of the mineral ownership, as such, or, more specifically, on the contractual rights of the parties with respect to the royalty due and the proper method of computing and paying it, was never at issue. They are not, therefore, controlling. In fact, they are authority for the proposition that private contractual rights in these leases are only superseded when they are in conflict with the valid orders of the Commissioner of Conservation, i. e., when the order is a conservation measure, pure and simple. Everett v. Phillips Petroleum Co., 218 La. 835, 51 So.2d 87, and the authorities therein cited.

■ The Department of Conservation was created by the Constitution of 1921 for the sole purpose of protecting, conserving, and replenishing the natural resources of this state, and the authority of the legislature to enact, and of the Commissioner of Conservation to enforce, is specifically limited to those measures that do "protect, conserve and replenish the natural resources of the State, and * * * prohibit and prevent the waste or any wasteful use thereof." Section 1 of Article VI of the Constitution of 1921, as amended, Act No. 328 of 1944, approved November 7, 1944. Pursuant to this authority, the legislature enacted Act No. 157 of 1940, LSA–R.S. 30:2 et seq., a comprehensive conservation statute, giving the Commissioner the authority, among other things, to prohibit the waste of oil and gas and to avoid the drilling of unnecessary wells by integrating in- to drilling units the maximum area he finds, as a fact, one well can efficiently and economically drain, Section 8(b) now LSA–R.S. 30:9, subd. B, the *owners* of separate tracts of land embraced within these units being permitted "to pool their interests and to develop their lands as a drilling unit," and the Commissioner, in the event they refuse so to do, being authorized to require them to. Section 9(a), now LSA–R.S. 30:10, subd. A and (1). The orders requiring such pooling "afford the *owner* of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense" and "prevent or minimize reasonable avoidable drainage from each developed tract which is not equallized by counter drainage" Section 9, subd. (a), now R.S. 30:10, subd. A(1) (a), and "The portion of the production allocated to the *owner* of each tract included in a drilling unit formed by a pooling order shall, when produced be considered as if it had been produced from his tract by a well drilled thereon." Section 9(a), now LSA–R.S. 30:10, subd. A(1) (b). In Section 2(h), the word *"owner"* is defined as "the person who has the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." Now LSA–R.S. 30:3(8). (Italics ours.)

■ The Commissioner of Conservation, in establishing 640 acres as the area in which the Bodcaw and Vaughn sands

should be developed in the Ruston Field, did not intend to, and did not, in fact, abrogate the contracts between the several lessors and their respective lessees with respect to the nature or structure of their mineral ownership, or alter in any way the consideration to be paid and the method of payment. The order was intended as a conservation measure only—to insure that the pool of gas in these sands underlying this section would be efficiently and economically drained,—and if it is to be given the effect contended by the plaintiff, not being a conservation measure, it would be beyond the constitutional and legislative authority given the Commissioner, and, therefore, an illegal extension of authority.

Obviously, the parties to the operating agreement, who are the lessees designated by the owners of the tracts comprising this unit to drill for and reduce to possession the oil and gas thereunder, took cognizance of this law, for, trekking these statutory provisions, they provided that "All gas and products produced from a gas well and saved from the unitized tract * * * and regardless of the location of the well * * * shall be apportioned and allocated to the several tracts comprising said Unit in the proportion that the acreage in the respective tracts bears to the total acreage forming said unit * * *." And while this clause is followed by the provision that "all royalties, overriding royalties and production payments shall be paid and accounted for by Operator to the respective owners thereof as their respective interests may appear, in accordance with the applicable terms and provisions of the oil, gas and mineral lease or leases, deeds, contracts or assignments affecting said tract" (Section 5), it is clear that when these two clauses are read together—and also with Section 6, where it is provided that each lessee "shall own and have the privilege of taking in kind * * * its proportionate share in and to all of the gas produced and saved," upon due notice to the Operator (the plaintiff here), in lieu of which notice the Operator may purchase the lessee's share and pay to the lessee direct his proportionate share of the proceeds realized from the sale of such gas, each party accounting "to the royalty owners under his or its respective lease or leases or mineral interests for such royalty owners' share of such productiton—that the lessees never intended to abrogate the provisions of their contracts with their lessors, the owners of these tracts. Further, if these provisions could be interpreted as having the effect contended by the plaintiff, they would not be binding on the royalty owners, since they were not made parties to this operating agreement and have not acquiesced therein.

■ It is our conclusion, therefore, that the royalty owners in this unit are entitled to be paid from the proceeds realized from the share of the production of this well al-

located to the tracts in which they have an interest, as specifically provided in their individual contracts.

For the reasons assigned, the judgment appealed from is affirmed.