FRUGÉ, Judge.
This is a Declaratory Judgment proceeding filed by plaintiff-appellant, Texaco, Inc., as Operator of the Erath Unit in Vermilion Parish, Louisiana, seeking judicial determination of certain rights under two unitization agreements, known as the Erath Agreements, consisting of a “Royalty Owners Agreement” and a “Unit Operating Agreement”. Plaintiff has perfected an appeal to this court from a judgment dismissing their suit.
In its Reasons for Judgment, the trial court stated:
“Texaco, Inc., filed this suit under R.S. 13:4231 et seq., for a declaratory judgment interpreting two unitization agreements affecting the Erath recycling plant units in Vermilion Parish. These agreements will be referred to herein as the ‘Erath Agreements,’ being an agreement entitled Royalty Owners Unitization Agreement, Erath Field, Vermilion Parish, Louisiana, and one entitled Unit Operating Agreement, Erath Field, Vermilion Parish, Louisiana, Exhibits 1 and 2 in this record, together with certain amendments thereto, copies of which are also in evidence as Exhibits P-3, P-4, P-5, and P-6.
*385 “The petitioner asks that it he decreed that these Erath Agreements cover and include, (1) all sands within the unit area below 8000 feet as described in the agreements, and (2) particularly the School Board Sand, within said unit, as defined in Conservation Order No. 34 — F, dated December 19, 1956, identified as Exhibit P-15.
“Defendants, numbering approximately six hundred persons, are all parties having an interest in the royalties, leases, minerals, and lands included in the Erath Unit, which comprises some 83 tracts of land. The surface area involved totals over four thousand acres.
“Plaintiff introduced the testimony of witnesses who took part in the formation of the Erath Unit. All are, and have been for many years, recognized as authorities in their respective fields. The purport of this testimony is that the Erath field was known to contain tremendous quantities of oil and gas bearing sands, that the original discoverers, holding leases in the unit area, concluded that the best method of developing these resources would be through the medium of a recycling plant, a method by which gas is brought to the surface, the condensate and other liquid hydrocarbons extracted therefrom, and then returned to the original reservoir beneath the surface of the earth. In order to carry out this proj ect, the Erath Agreements were formulated by a committee of geologists, petroleum engineers, and other experts in the oil industry, ‘and attorneys representing the operators, royalty owners, and landowners. All available geophysical information resulting from the drilling of the first ten or eleven wells was used, and the equities of all parties calculated, using what is termed the acre-foot method, whereby the net sand content under each tract of land was determined, and an estimate made of all hydrocarbons in place to determine the value of the ultimate production to be obtained from each tract of land.
“The operating committee determined that some eighteen additional wells should be drilled under the unit agreements, to provide more complete information on sub-surface formations, and thereafter a final calculation of equities using such information would be made. This was done according to the terms of the Erath Agreements, the final calculation of equity made, and the project was successfully operated to the satisfaction of all parties until 1956.
“As a result of the extensive drilling conducted in the field, the one fault found, which lies in the northern portion of the unit, was pin-pointed with unusual accuracy, the various sands underlying the unit area were measured and the general overall intent of the agreements, to secure to each landowner his fair and equitable share of the products recovered, was thought to be insured, without regard to the actual location or spacing of the wells in the field.
“The agreements provide in paragraph I (b), under definitions, as follows :
“'(b). Unitized Substances — Unitized substances shall mean and include gas, gasoline, condensate, distillate, methane, ethane, propane, butanes, pentanes, hexanes, heptanes, and heavier hydrocarbons,' residue gas, and unprocessed gas * * * contained in those sands or reservoirs underlying the Unit Area known and designated as the 8,50CK sand * * * and thef unnamed sand found in Phillips Petroleum Company's well Fitzsimmons No. 1, at 11,934-11,945V (Emphasis supplied.)
*386 Following this paragraph, they provide generally what the term unitized substances includes, this being all gas and the hydrocarbon content thereof found at a depth greater than 8000 feet below the surface of the earth and within the unit area, which is in a gaseous phase under virgin reservoir pressure in the reservoir. The only gas or hydrocarbon content of gas excluded from the terms of the Agreements was that having a gravity of less than 50 degrees A. P. I. at a temperature of 60 degrees Fahrenheit ‘and contained in sands or reservoirs found and located below 8000 feet and within the Unit Area (other than those known sands and reservoirs hereinabove specifically designated), and provided further that such hydrocarbons are not in a gaseous phase under virgin reservoir pressure and in place.’
“The unnamed sand found in the Fitzsimmons No. 1 well, mentioned above, was South of the fault line running across the northern portion of the unit area. What is believed to be the same sand, or its stratigraphic equivalent North of the fault was reached in two wells drilling in the early stages of the explorations, the 40-1 well where the sand contained salt water and has never produced, and the Phillips-Caldwell '#1 well, wherein the sand reached but considered dry. These two wells North of the fault were outside of what was finally decided upon as the Unit Area.
“In consequence of the foregoing information at the time of formation of the units, the unnamed sand in the Fitzsimmons '#1 well, as it existed North of the fault, was considered to be unproductive commercially, and no credit was assigned to the unit lands North of the fault for this sand. The only credit allowed for this sand in the computation of equities specified in the Erath Agreements, was to the Fitz-simmons tract South-of the fault.
“Since this is the disputed sand in this case, we will hereinafter refer to it as the School Board Sand, and the Court will now state that it considers the evidence at the trial to preponderate to the effect that this sand as found North of the fault is the equivalent of the sand found in the Fitzsimmons well South of the fault.
“In 1954 Phillips Petroleum Company, carrying on exploration on leases owned by it North of the Erath Unit Area (also north of the fault line which runs generally from east to west), obtained production from the School Board Sand in certain of its wells. Thereafter, in 1956, the Unit Operators deepened the 3-2 unit well within the unit area and North of the fault line, and obtained production from the School Board Sand. This well is located on tract 3 of the Unit, belonging to the Vermilion Parish School Board.
“Further development resulted in the Conservation Department’s Orders embraced in the 34-F series, establishing units for the School Board Sand, one of which is located entirely within the Erath Unit Area as described above. Plaintiff’s Exhibit B shows the location of the School Board Sand units in relation to the original Erath Unit, as well as the ownership and numbers of those tracts of land affected thereby which lie within the original unit lines.
“When it became apparent that royalties from this production would be paid on the same basis as provided for in the Erath Agreements, the Vermilion Parish School Board protested to the Unit Operator, demanding its full royalty share in this production from the School Board Sand underlying its tracts 3 and 4 North of the fault *387 area. The matter was presented to the Commissioner of Conservation, who, on November 6, 1957, issued a ‘Clarification of Order No. 3d — F’ setting forth expressly that that order was merely to regulate the spacing of wells and the creation of drilling and production units within the School Board Sand reservoir and not to determine whether the production from the School Board Sand was affected by the private contract between the parties known as the Erath Unit Agreement.’
“Primarily, this inquiry must decide whether or not the School Board Sand as it exists under those lands embraced within the Erath unit area, is subj ect to the Erath Agreements.
“The Vermilion Parish School Board and certain other landowners and mineral owners whose interests in the unit lie North of the fault, maintain that this sand is not covered by the Agreements, principally because (1) there is no consideration therefor, (2) it is ultra vires, violating Act 96 [93] of 1936 and its amending statute, Act 153 of 1942, (3) there was an error or mistake of fact, vitiating the School Board’s consent, and (4) if applicable, the agreements constitute a gift or donation of the Board’s interest in the sand, which is null and void. These arguments have been adopted and advanced by the other parties opposing the suit of the petitioner, Texaco, Inc.
“The record is voluminous, consisting of two drawers of a filing cabinet containing the exhibits, introduced at the trial, testimony of witnesses, and other documents in the case. Able counsel representing the various litigants, with unusual diligence and an abundance of energy have compiled some 227 pages of written briefs covering all points of law and fact that can be conceived, and all arguments that could be advanced under this wealth of material.
“This Court does not have the time nor the inclination to discuss the record in detail. The salient facts are as outlined above.
“The Erath Agreements must be interpreted in the light of pertinent articles of our Civil Code, wherein we find the following:
“ ‘Art. 1945. Legal agreements having the effect of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:
“ ‘First — That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
“ ‘Second — That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
“ ‘Third — That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;
“ ‘Fourth — That it is the common intent of the parties — that is, the intention of all — that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract. (As amended by Acts 1871, No. 87)
“ ‘Art. 1949. When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question.
“ ‘Art. 1950. When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.’
*388 Also of interest in the discussion to follow are Articles 1959, 1960, and 1961.
“Plaintiff introduced oral testimony of witnesses who were present during the formation of the agreements, and also transcripts of hearings conducted by the Conservation Commissioner containing the testimony of various witnesses called on those occasions. The Court advised counsel once or twice during the trial that this evidence would not be considered admissible, under the general rule that conversations and negotiations leading up to a written agreement are not to be considered after execution of the contract unless there is ambiguity in the written document. Art. 1945(3). Revised Civil Code. No weight has been attached to this evidence by the Court, although it was permitted to go into the record subject to the objections of the defendants, for purposes of appeal.
“Examining the contracts in this case, and confining the inquiry to the four corners of the instruments, we find that they were executed for the purpose of obtaining maximum recovery through the recycling plant operation, from the many valuable sands underlying the Erath Unit. The operating companies were willing to assume the expense of this undertaking, provide the plant facilities, and operate the project.
“Both the Royalty Owners agreement and the Operators Agreement are correlative and complementary to each other. References made in each contract to the provisions of the other, and in order to ascertain the intent of the parties, they must be read and construed together.
“In Article IV of the Royalty Agreement, duplicated in Article V of the operating agreement, the parties set out the formula by which the equity of participation in each tract embraced within the unit was calculated as of June 1, 1942, and they then proceed to stipulate in Article XVI of the Royalty Agreement that additional wells would be drilled, and then not later than June 1, 1944, these equities would be recalculated by the unit operator according to this same formula as provided in Article XXV of the operating agreement. This was done, and a revised Exhibit D, showing the percentages of equity was calculated and filed after the known reservoirs at the time had been fully explored. These equities are the moving cause for the Agreements.
“The entire purport of the agreements was and is to insure for each landowner the value of the minerals in place under his land, then known to exist and to be discovered thereafter below 8000 feet.
“The School Board Sand fits the definition of unitized substances and is the geological equivalent of one of the known sand reservoirs in 1942, found in the Fitzsimmons well, South of the fault. But the School Board Sand North of the fault line was not a known reservoir or sand in 1942, as that term is used in these agreements. If included in the agreement at all, it is under the second paragraph of Article 1(b), which reads as follows:
“ ‘Unitized substances shall also mean and include gas (including all hydrocarbon content thereof) and any mixture of liquid hydrocarbons in the proportions condensed or absorbed from or separated out of, the gas and contained in sands and reservoirs found and located at a depth greater than 8000 feet below the surface of the earth and within the Unit Area, provided such liquid hydrocarbons under virgin reservoir pressure are in a gaseous phase in the reservoir.’
*389 This language clearly and unmistakably includes such unknown reservoirs, but the calculation of equities set out in Exhibit ‘D’ of the Agreements, recalculated as provided in Exhibit ‘E’ of the Royalty Agreement (subsections (a), (b), and (c) of Section 1 of Article XXV of the Unit Operating Agreement) has application only to the sands and reservoirs known to exist and to contain 'unitized substances’ on June 1, 1942, determined with exactness after the completion of the additional wells provided for in the contracts, but not later than June 1, 1944. Thus all'parties, Royalty Owners, and operators, fixed their equities in accordance with the obvious intention of all parties, to secure for each the full acre-foot value of the known reservoirs underlying his property.
“Having concluded that the original and revised Exhibit ‘D’ (calculation of equities) applies only to sands and reservoirs known to contain unitized substances on June 1, 1944, we must examine the contracts further to seek out the parties’ intention regarding unknown reservoirs, or the second paragraph of Article 1(b) of the agreements can have no effect, and the School Board Sand as it is found today North of the fault area is not covered by these agreements, but by the terms of the original leases and the 34-F series of orders of the Conservation Commissioner.
“In addition to the rules laid down in Articles 1949 and 1950 of the Revised Civil Code quoted above, Article 1951 of the Code is particularly illuminating here. It provides:
“ ‘Article 1951. When a clause is susceptible of two interpretations, it must be understood in that in which it may have some effect, rather than in a sense which would render it nugatory.’
and, further, Article 1955 says:
“ ‘Article 1955. All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act.’
“Bearing these fundamental concepts in mind, it will be noted that both agreements provide for the operation of the Unit Area by an ‘Operating Committee,’ having certain well defined powers and authority outlined in Article XI of the Operating Agreement. This article provides in part as follows:
“ ‘The operating committee shall have, among other powers, the specific powers and duties enumerated below:
“‘3. To approve or disapprove the drilling of additional wells either for the production of unitized substances or for injection wells.
“‘11. To adjust equities and ownerships in the Unit Area as provided by this Agreement.
“ ‘12. To appoint and grant authority to such subcommittees as it may deem proper and requisite, as for example, Legal Committee, Engineering Committee, Geological Committee, Auditing Committee, and Tax Committee.
“ ‘13. The Operating Committee shall have all such powers and duties as are provided by any other provision of this Agreement, either expressly or by implication, and such other powers and duties as may be reasonably necessary in supervising and controlling operations of the Unit Area and building and operating the extraction and cycling plant.’ (Emphasis supplied.)
“ ‘Counsel for Texaco, Inc., Humble Oil Company, and others in opposition to the position taken by the defendants having interest in the Unit Area North of the fault line, maintain *390 that sub-paragraph 11 above has reference only to the final calculation of equities in the manner set out in Exhibit “E” of the Royalty Agreement, effected on June 1, 1944. However, we note that this paragraph is carefully preserved in amendments to Article XI of the Unit Operating Agreement, occurring as late as 1949, as shown by Exhibit P-3. There can be no doubt that it applied to this determination of equities in 1944, but it is equally clear that the power to “adjust equities * * * as provided in this Agreement” has general application as well, and particular reference to the formula for calculating equities in keeping with the primary intention of the parties, to insure to each of the parties “his fair and equitable share of the products recovered.” Article 1962 of the Revised Civil Code of this State provides :
“'‘Art. 1962. When a contract contains general obligations, and the parties, in order to avoid a doubt whether a particular case comes within the scope of the agreement, have made special provision for such case, the general terms of the contract shall not on this account be restricted to the single case that is provided for.’
“Surely these experienced and learned professional men who undertook the formulation and adoption of these agreements and this pioneer project of the industry they serve recognized in 1942 and in 1944 that there could be vast unknown reservoirs of unitized substances underlying the Unit Area which would or could be reached and tapped in the future by improved drilling techniques to greater depths, and most profitably produced by extractions and cycling of these gaseous substances in the recycling plant. So elementary is such a concept that the Court does not doubt that every landowner and royalty owner, most of whom are laymen, understood that this possibility existed. For this reason, the original and revised calculation of equities detailed in Exhibit ‘D’ of the agreements was and is restricted to sands and reservoirs known to contain unitized substances in 1942 and 1944, and the calculation of equities in such reservoirs undiscovered at that time but included in the above quoted second paragraph of the definition of ‘Unitized SubstancesJ was left to future determination by the Operating Committee subject to the approval of the Conservation Commissioner, all ‘as provided in this Agreement.’
“Not only is this conclusion apparent from the agreements, but the duty of the Committee to so fulfill its obligations is to be implied from the very nature of the contracts in question. There is no evidence whatsoever of an intention on the part of these landowners and operators to irrevocably fix or -freeze’ their participation in production from the unit area for all time, and as to all possible unknown reservoirs of unitized substances. Indeed, the contrary is expressly shown by the clear restriction of Exhibit ‘D’ interpreted in the light of Exhibit ‘E’ of the Royalty Agreement, and other pertinent provisions of the agreement, to such reservoirs as were known and exactly determined at that time.
“Nor can it be said that such an interpretation, giving effect to all of the clauses of the agreements, has the effect of changing or varying Exhibit ‘D’, for the same reason, repeated for emphasis, that such calculations as are detailed in the revised Exhibit ‘D’ remain in effect and pertain only to the reservoirs contemplated therein, known to exist at that time.
“Having adopted this interpretation of the Erath Agreements, the authority of the Commissioner of Conserva *391 tion in respect to the School Board Sand is limited as stated by him in the Clarification of Order 34-F, dated November 7, 1957. Monsanto Chemical Co. vs. Southern Natural Gas Company, 234 La. 939, 102 So.2d 223, and Arkansas-Louisiana Gas Company vs. Southwest Natural Production Company, 221 La. 608, 60 So.2d 9.
“Judgment is hereby rendered and formal decree will be signed after preparation and presentation for signature, jointly by the attorneys for Texaco, Inc., and the attorneys for Vermilion Parish School Board, declaring and fixing the rights of the parties to the Erath Agreements as follows:
“1. The School Board Sand as defined hereinabove is covered by the Erath Agreements, as amended, as are all sands below 8000 feet located beneath the Unit Area as delineated by said agreements and containing ‘unitized substances’ defined in Article I (b) of said Erath Agreements, whether or not said sands and reservoirs were known or unknown at the time of the confection of such agreements.
“2. The percentage of equities allocated to each numbered tract of the Unit Area, expressed in Exhibit ‘D’ of said agreements as finally amended, recalculated, and revised, has application only to those sands and reservoirs located in the Unit Area known to contain unitized substances capable of being produced commercially on and as of June 1, 1944.
“3. Said percentage of equities as expressed June 1, 1944, does not apply to the School Board Sand Reservoir containing unitized substances discovered in 1956 North of the fault line lying in the North portion of the Unit Area, as delineated on Exhibit P-B, nor does it apply to any other like sands and reservoirs in said Unit Area below 8000 feet which were not known and discovered as commercially productive horizons as of June 1, 1944.
“4. The Unit Operating Committee, subject to approval of the Commissioner of Conservation of the State of Louisiana, is expressly charged with the power and duty to calculate the percentage of equity of each tract lying in the Unit Area north of the fault line shown on Plaintiff’s Exhibit P-B, with respect to the School Board Sand underlying said tracts, using the method and formula set out in Article IV of the Royalty Owners Agreement and in Article V(l) of the Unit Operating Agreement applicable to known reservoirs in Jun'e, 1942, and 1944, and the participation of all parties having interests in and to production from the tracts North of the fault line is to be governed accordingly.
“5. All sands and reservoirs containing unitized substances as defined in said agreements capable of being produced commercially and located below 8000 feet from the surface of the earth, not known and determined in June, 1942, or June, 1944, which may be hereafter placed in production, are to be similarly calculated and treated.
“6. The provisions of Article XI (3), (11), (12), and (13) of the Unit Operating Agreement are held to be applicable to such new sands and reservoirs containing unitized substances, hereafter placed on production in the unit area, including the School Board Sand north of the fault line shown on plaintiff’s Exhibit P-B, and the grant of express and implied powers of said Unit Operating Committee therein set out is held to include the giving of notices to all interested parties of such calculations and adjustments as may be or hereafter become necessary hereunder for the purpose of carrying out the objects of said Erath Agreements for the benefit of all parties in inter *392 est, in keeping with the views herein expressed.
“7. It is further held that such notices of calculations and adjustment of equities in said sands and reservoirs containing unitized substances capable of being commercially produced, are impliedly required to be done with reasonable dispatch, and to follow as to form the original notices, allocations and delineations set out in Exhibits ‘A’, ‘B’, ‘C’, and ‘D’ of the Erath Agreements, as may be reasonably possible.
“The fees of the expert witnesses attending and testifying at the trial are fixed in the sum of $75 per day for each day’s attendance. The fees of the attorneys appointed herein to represent absent defendants are fixed as follows:
I. P. Saal, Jr. o lo co
Roger C. Edwards o lo m
Lavelle Broussard © tn h
Carol L. Spell o :o cj
“All of the above mentioned fees are to be taxed as costs, and costs are to be paid by petitioner, Texaco, Inc., Unit Operator of the Erath Unit.”
Although we believe that the trial court has covered all necessary points, nevertheless, we would like to re-emphasize certain things.
Early in the development of oil and gas production from the area now known as the “Erath Field”, the interested parties in the area recognized that joint efforts would be required to further the cause of conservation and obtain maximum recov-erability of the hydrocarbons located beneath the area. After intensive geological study and negotiation two unitization agreements were executed. The first, “Royalty Owners Utilization Agreement, Erath Field, Vermilion Parish, Louisiana” was executed by those persons having royalty interest in the area. The second agreement, complementary in nature, was entitled “Unit Operating Agreement, Erath Field, Vermilion Parish” and executed by the various leasehold owners. These agreements are in the record as Exhibits 1 and 2, respectively, and will be referred to herein as “Erath Agreements”. A general plan of production, essentially a recycling operation, was established by the Erath Agreements and an Operating Committee was appointed to implement the plan.
The Erath Agreements established that the division and relative ownership of the production from the Erath Unit would be determined by a calculation of equities. Most simply stated, the production was payable to the various individuals in the proportion which the recoverable hydrocarbons in place attributable to each individual’s tract ownership bore to the total recoverable hydrocarbons in place within the Unit area. The original Erath Agreements set forth a tentative Unit area and equity allocation. The agreements further provided that additional wells would be drilled and that a subsequent study would be made to determine the actual unit area and the precise equity allocation. This was accomplished in 1944 and is embodied in revised Exhibit “D” to the agreements. Production in paying quantities has been maintained continuously since the execution of the Erath Agreements, and royalties were paid from 1944 to 1956 in accordance with the equities as set forth in revised Exhibit “D”. 4 In 1956 the “School Board Sand” was discovered to be productive North of the major East-West fault running through the Erath Unit. The Conservation Department established various units for production from the School Board Sand by its 34-F series of orders. One of the units so established is located entirely within the Erath Unit area. The Vermilion Parish School Board and others, made demand on Texaco, Inc. (as Operator of the Erath Unit) to be paid on the basis that the Erath Agreements did not affect the School Board Sand. Texaco, Inc. brought this declaratory judgment action to determine (1) if the School Board Sand is covered by the Erath Agreements, and (2) the proper *393 method of payment of royalties accruing for production from the School Board Sand within the Erath Unit. The judgment of the Trial Court decreed that the School Board Sand was covered by the Erath Agreements but held that only the parties having interests in tracts overlying the School Board Sand reservoir North of the fault would be entitled to participate in production from that reservoir. The Court further ordered the Unit Operating Committee of the Erath Unit to recalculate the equities and to make future payments in accordance with the revised equities.
Plaintiffs (referring to and relying on Monsanto Chemical Co. v. Southern Natural Gas Co., 234 La. 939, 102 So.2d 223 and Arkansas Louisiana Gas Company v. Southwest Natural Production Company, 221 La. 608, 60 So.2d 9, which was cited in the Monsanto case, supra) state that the Monsanto agreement and the Erath Agreements are identical. We have noted these cases and we believe that they are inap-posite and clearly distinguishable from the instant case. In the Monsanto case, supra, an agreement was entered into between various lease owners of oil and gas leases covering Section 31, T.17 N., R.S.W. integrating their interest in section 31 “for the discovery and production of gas from any and all horizons, formations or zones.” This agreement further provided that “to remain in full force and effect so long as said Section 31 * * * constitutes a unit for the development and production of gas from any horizon, formation or zone, whether under the terms of pooling and unitization agreements, or orders of the Department of Conservation of the State of Louisiana covering said unit, or any extension or renewal thereof, by production or otherwise.” In accordance with this agreement a well was drilled and completed.
Factually, the Monsanto case, supra, differs from the instant case in that commercial production had already been obtained in the Erath Field prior to the confection of the Erath Agreements, and bona fide and diligent attempts were being made to determine as nearly as possible the exact amount of productive sands under each tract and to adjust the equities accordingly.The Erath Agreements may be analogized to a compact where each party is to receive an equitable share of the production in accordance with the productive sands which underlie his respective property. On the other hand in the Monsanto case, supra, the parties did not know in advance whether Section 31 would be entirely productive, nor could they even make any attempt to allocate equity on the “acre-foot” basis as was done in the Erath Agreements. In the Monsanto case, supra, the agreement may be analogized to an act of exchange whereby parties- — not knowing in advance what hydro-carbons lie under their respective properties — enter into an act of exchange to share any and all production from a given area or “unit” (example Section 31) and the percentage of royalty is fixed in advance according to the surface acreage contributed to the “unit” rather than the amount of “acre-foot” of productive oil gas sand or sands located under the property of the various owners. Certainly the legality and binding effect of such “acts of exchange” of speculative mineral royalty interest (as in the Monsanto case) in a relatively undeveloped area or “unit” can be questioned, and these acts of exchange and these private contractual rights are “only superceded when they are in conflict with the valid orders of the Commissioner of Conservation, i. e., when the order is a conservation measure, pure and simple. * * * ” (See Monsanto Chemical Co. v. Southern Natural Gas Company, supra.) The purpose of the Erath Agreements, as contrasted from the Monsanto- case, was to determine in advance the exact amount of “acre-feet” under each tract and fix the royalty participation accordingly; the most outstanding feature of this agreement was the goal of attempting to achieve equitable distribtition of royalty.
We believe that, under the facts and circumstances of this particular case, the solution set forth by Judge Putnam and de *394 tailed in his judgment and the reasons therefor, is eminently correct, and we, therefore, adopt his reasons as our own and affirm, his judgment.
For the reasons assigned, the judgment of the trial court is affirmed.
Affirmed.