# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 16-468

**FRANK HAYES GLADNEY AND MARGARET STELLA GLADNEY GUIDROZ**

**VERSUS**

**ANGLO-DUTCH ENERGY, L.L.C. AND ANGLO-DUTCH (EVEREST) L.L.C.**

**\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**THIRTY-FIRST JUDICIAL DISTRICT COURT**
**PARISH OF JEFFERSON DAVIS, DOCKET NO. C-1-14**
**HONORABLE STEVE GUNNELL, PRESIDING**
**\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion, Judges.

**REVERSED.**

Larry C. Hebert
William H. L. Kaufman
G. Quinn Salmon
Michael C. Wynne
Ottinger Hebert, L.L.C.
1313 West Pinhook
P.O. Drawer 52606
Lafayette, LA  70505-2606
(337) 232-2606
**ATTORNEY FOR PLAINTIFF/APPELLANT**
   Frank Hayes Gladney and Margaret Stella Gladney Guidroz

Stephen D. Baker
Law Office of Stephen D. Baker
412 West University Avenue, Suite 101
Lafayette, LA  70506
(337) 235-8298
**ATTORNEY FOR PLAINTIFF/APPELLANT**
   Frank Hayes Gladney and Margaret Stella Gladney Guidroz

2

Samuel E. Masur
Paul B. Simon
Gordon, Arata, McCollum, Duplantis & Eagan, L.L.P.
400 E. Kaliste Saloom Road, Suite 4200
P.O. Box 81829
Lafayette, LA  70598-1829
(337) 237-0132
**ATTORNEY FOR DEFENDANT/APPELLEE**
    Anglo-Dutch Energy, L.L.C. and Anglo-Dutch (Everest), L.L.C.

**COOKS, Judge.**

In this appeal involving a royalty dispute, Defendants, Anglo-Dutch Energy, L.L.C. and Anglo-Dutch (Everest), L.L.C. (hereafter Anglo-Dutch), are oil and gas operators, who had an Oil, Gas and Mineral Lease with Plaintiffs, Frank Hayes Gladney and Margaret Stella Gladney Guidroz.

On August 28, 2009, Plaintiffs granted a mineral lease over its land to Anglo-Dutch. That lease provided Plaintiffs were entitled to a one-fifth royalty on all oil, gas or other minerals reduced to possession by Anglo-Dutch from Plaintiffs' land. On February 14, 2012, Anglo-Dutch began a gas well on Plaintiffs' property which was completed on April 27, 2012. The reservoir and zone from which the well was to be produced were under the property of multiple landowners, not just Plaintiffs' land. Anglo-Dutch commenced sales of production from the gas well on May 18, 2012.

On May 11, 2012, Anglo-Dutch began proceedings to apply for a compulsory drilling and production unit for the well in question by filing a "pre-application notice" with the Louisiana Office of Conservation. A drilling and production unit combines all the land over a reservoir into a single "unit" and allocates all the production from it to the various landowners. The Commissioner of Conservation determines the percentage of production allocated to each landowner. Generally, the percentage corresponds to the proportion of each owner's land in the unit.

It is required that once proceedings to apply for a drilling and production unit are begun, a "conditional allowable" is issued for the well. A conditional allowable is a measure granted by the Commissioner of Conservation that authorized the operator of the well to extract a specific volume of production from a reservoir prior to the establishment of a unit. The conditional allowable ensures that owners of tracts within the unit receive their equitable share of production

3

from the sale of minerals extracted. Anglo-Dutch applied for a conditional allowable on May 15, 2012, which set forth:

> All monies generated from the date of first production, the disbursement of which is contingent upon the outcome of the current proceedings before the Office of Conservation for the Frio Zone will be disbursed based upon results of those proceedings.

Anglo-Dutch's application for the conditional allowable was granted on May 17, 2012, and Anglo-Dutch began to produce the well the following day.

On July 3, 2012, Anglo-Dutch submitted its formal application for the unit. A public hearing was held on October 30, 2012, and Anglo-Dutch completed the required legal publication of notice under the rules of the Commissioner of Conservation. On January 23, 2013, Order No. 124-Y was issued establishing the unit. The Order specifically stated it "shall be effective on and after October 30, 2012."

In letters dated March 5, 2013 and March 18, 2013, counsel for Plaintiffs made demand on Anglo-Dutch for the alleged non-payment of royalties due. Plaintiffs contended despite the October 30, 2012 effective date of the Commissioner's Order, Anglo-Dutch refused to pay Plaintiffs their full one-fifth Lessor's royalty established by the Mineral Lease between the parties for production prior to October 30, 2012. Plaintiffs reasoned, after the October 30, 2102 effective date, royalties could be paid on the "unit tract" basis, but until that date, they were entitled to their full one-fifth Lessor's royalty. It was admitted by all parties that as of October 30, 2012 moving forward, each owner within the unit was only entitled to the unit production in proportion to their surface acreage contained within the geographic confines of the Unit, and in Plaintiffs case, that was slightly over 78%.

Anglo-Dutch maintained Plaintiffs were not entitled to the full lease-basis royalty for pre-Unit production because the issuance of the conditional allowable

4

required them to pay only on a unit-basis. It was their position the issuance of the conditional allowable replaced its obligations under the Mineral Lease between the parties to pay full lease-based royalties.

Despite the Plaintiffs' demands, Anglo-Dutch withheld all payments until April 2013, and at that point, they conditionally tendered "royalty payments" to Plaintiffs on a "unit-basis" for the production extracted from the well. The royalty checks did not contain any notation stating it was in "full payment" or in satisfaction of Plaintiffs' claims for lease-based royalties; however, Plaintiffs refused to cash these checks unless Anglo-Dutch executed an agreement specifically stating the checks were not in fact full payment. Anglo-Dutch refused.

On January 2, 2014, Plaintiffs filed suit against Anglo-Dutch for breach of contract and requested damages for Anglo-Dutch's failure to make timely payments of the full lease-based royalties and unconditional payment of the undisputed unit-basis payments owed. On November 3, 2015, Plaintiffs filed a Motion for Summary Judgment contending because the conditional allowable did not abrogate Anglo-Dutch's obligation under the Mineral Lease between the parties to pay the full lease-based royalties, they were entitled to judgment in their favor. On January 7, 2016, Anglo-Dutch filed a Cross Motion for Summary Judgment, arguing by virtue of its obtaining the conditional allowable, it was required to pay only unit-based royalties to Plaintiffs. On March 8, 2016, a hearing was held on both motions. At the close of the hearing, the trial court granted Anglo-Dutch's motion, and dismissed all of Plaintiffs' claims by a judgment rendered on March 28, 2016. The trial court ruled in Anglo-Dutch's favor, stating the following in its "Reasons for Ruling":

> The Court granted [Anglo-Dutch's] motion and stated that the "allowable covers the royalty payments" because even though the unit was October 30th, it goes back to the date of production under the allowable. The Court also stated that [Plaintiffs have] not shown any other provision in the lease contract which would require them to be

5

paid more than is allowed by the commissioner under the allowable and the unitization agreement. The date of first production is the effective date. The Court also declined to include in its ruling an order that the plaintiffs be paid the unit basis on unconditional terms.

This appeal followed wherein Plaintiffs contend the trial court erred in holding that the unit's stated October 30, 2012 effective date was altered to the date of first production by virtue of Anglo-Dutch requesting and obtaining a conditional allowable prior to that date. Plaintiffs also assert the trial court erred in holding they failed to identify any provision in the Mineral Lease between the parties which obligated Anglo-Dutch to render payment of a sum greater than the unit-basis royalty guaranteed by the conditional allowable.

## ANALYSIS

This case poses a question of law; thus, the appropriate standard of review is *de novo*. *Citgo Petroleum Corp. v. Frantz*, 03-88, p. 3-4 (La.App. 3 Cir. 6/4/03), 847 So.2d 734, writ denied, 03-1911 (La.10/31/03), 857 So.2d 484. Our review of questions of law is simply to determine whether the trial court was legally correct or legally incorrect. *Id.* If the trial court's decision is based on an erroneous interpretation or application of the law, rather than a valid exercise of discretion, that decision is not entitled to deference by the reviewing court. Further, appellate courts review summary judgments *de novo* using the same criteria that govern a district court's consideration of whether summary judgment is appropriate. *Schroeder v. Board of Supervisors of Louisiana State University*, 591 So.2d 342 (La.1991).

The dispute in this case only concerns the amount of royalties due Plaintiffs for the time period from May 17, 2012, the date of first production under the conditional allowable, through October 30, 2012, which was the effective date of the unit established by the Commissioner of Conservation's Order. Following

6

October 30, 2012, the parties do not disagree as to the royalty amount Plaintiffs are entitled to under the unitization order.

According to the trial court's ruling "'the allowable covers the royalty payments' because even though [the effective date of] the unit was October 30, 2012, it goes back to the date of production under the allowable." This ruling essentially makes the unit effective prior to the specified effective date set forth by the Commissioner in the Order creating the unit. Plaintiffs contend this is legal error. We also note the trial court's reasons for ruling state the Plaintiffs have "not shown any other provision in the lease contract which would require them to be paid more than is allowed by the commissioner under the allowable and the unitization agreement." We disagree with this statement, as the Mineral Lease between the parties clearly provided Plaintiffs were to get lease-basis royalties on all production from the well and that lease governed the parties' relationship prior to the unitization order, which was not made effective by the Commissioner until October 30, 2012.

Title 30 of the Louisiana Revised Statutes, provides the statutory authority for the Office of Conservation, and its head, the Commissioner, to conserve and regulate the oil, gas and mineral resources of this state. To this end, the Commissioner's authority to unitize and issue allowables is an appropriate exercise of the State's police powers pursuant to La.R.S. 30:4(A), which vests the Commissioner with the "authority over all persons and property necessary to enforce effectively the provisions of this Chapter and all other laws relating to the conservation of oil and gas.

Plaintiffs cite consistent jurisprudence of this state that "the Office of Conservation does not attempt to interpret private mineral leases and other private contracts, as they are beyond its jurisdiction and authority." *Yuma v. Thompson*, 98-1399 (La. 3/2/99), 731 So.2d 190, 197. In *Arkansas Louisiana Gas Co. v.*

7

*Southwest Natural Production Co.*, 60 So.2d 9, 11 (La. 1952), the Louisiana Supreme Court explained that the Commissioner of Conservation, when establishing a drilling unit, "did not intend to, and did not, in fact, abrogate the contracts between the several lessors and their respective lessees with respect to the nature or structure of their mineral ownership, or alter in any way the consideration to be paid and the method of payment." The trial court's judgment holding that Anglo-Dutch's royalty obligations under the Mineral Lease were abrogated by the terms of the conditional allowable is in direct contrast to this longstanding rule that the Commissioner nor his office should alter private contractual rights.

Plaintiffs also introduced the affidavit of John R. Aldridge, who was an employee of the Office of Conservation for approximately thirty-five years and regularly presided over unitization hearings as the chief hearing officer. Mr. Aldridge notes he was familiar with the allegations made in the litigation between the parties and attested "[t]he issuance of a conditional allowable is not intended to affect in any manner the private contractual obligations of an operator or lessee on whose land is situated a well which is the subject of a unit application." He also stated "[t]he Office of Conservation issues a conditional production allowable without consideration of, and without prejudice to, any private contractual rights between the operator and the landowner-lessee on whose lands the well is drilled."

In support of its argument that the issuance of the conditional allowable altered the effective date of the unit to the date of first production, Anglo-Dutch relied on *Exxon v. Thompson*, 564 So.2d 387 (La.App. 1 Cir. 1990), *writ denied*, 568 So.2d 1054 (La. 1990). In that case, the appellate court discussed the Commissioner's authority to issue conditional allowables. The court in *Exxon* cited with approval the Commissioner's explanation of the purpose and effect of a conditional allowable:

8

That upon receipt of a pre-application notice, the Commissioner of Conservation does not issue additional permits to drill to the same sand within the proposed unit. Thus, in order to protect the correlative rights of all parties affected by curtailment of their right of capture, and to prevent waste that would result from the drilling of unnecessary wells, the Commissioner of Conservation grants only conditional allowables, requiring that all funds be escrowed from the date of the pre-application notice until an order issues creating the unit(s) and requiring that thereafter the escrowed funds be dispersed (sic) in accordance with the unit order.

Plaintiffs note the above explanation by the then Commissioner of Conservation,[1] does not refer to any altering of the effective date of a unit established by the Commissioner's order, but only states the issuance of the conditional allowable "requir[es] that all funds be escrowed from the date of the pre-application notice until an order issues creating the unit." *Id.* at 395. The passage then provides the escrowed funds must be dispersed based upon the percentage assigned to them by the Commissioner's unit order.

As Plaintiffs note, the practical effect of the decision in *Exxon* applied to unleased owners. The operator in *Exxon* was also the actual landowner where the producing well was located. There was no mineral lease in effect in *Exxon*. Despite this, the court in *Exxon* stated the "owner-operator (Exxon) has a choice of shutting the well in until a unit is created or accepting the conditional allowable." *Id.* at 396. Clearly in the facts of *Exxon*, the owner-operator would have no incentive to shut-in the well. As Plaintiffs note, it can be inferred that the court in *Exxon* "implicitly warns operator lessees of the precarious prospect of having to pay their drillsite lessor contractual royalties over and above those unit-based royalties guaranteed by the conditional allowable." We agree with Plaintiffs, that if there is no continuing obligation on the part of a lessee-operator to fulfill the terms of their contract with the mineral lessor, the option to shut in the well as articulated by the *Exxon* court is rendered entirely superfluous.

---

[1] The Louisiana Commissioner of Conservation is appointed by the Governor and serves a four-year term.

Plaintiffs also point out the unitization order in the present case specifically provides the unit becomes effective on October 30, 2012, not on the date of first production as was the case in *Exxon*. We agree this is another material factual distinction between the present case and *Exxon*. We find Anglo-Dutch's reliance on *Exxon* misplaced when examined under the particular facts of this case.

Anglo-Dutch has also argued Plaintiffs' action in this case is an impermissible collateral attack on the actions of the Commissioner. We disagree. Plaintiffs have consistently maintained they do not challenge the unit order or the conditional allowable, or the Commissioner's authority to issue same. Rather, Plaintiffs seek recognition of their right, and Anglo-Dutch's corresponding obligation, to be paid a one-fifth royalty on production **before** the effective date of the Unit. Plaintiffs have maintained this position from the beginning as can be seen from the following correspondence sent from Plaintiffs' counsel to Anglo-Dutch in the beginning stages of the litigation:

> The lawsuit that I will be preparing will not challenge the authority of the Commissioner to issue a *conditional allowable* in compliance with the unit yet to be created but will focus on the simple breach of contract by Anglo-Dutch in failing to make lease based royalty payments and unit based royalty payments to the Lessors, Frank Gladney and Margaret Stella G. Guidroz based upon royalty demand made March 18, 2013, . . .against Anglo-Dutch Energy, L.L.C.

Plaintiffs cite the Louisiana Supreme Court case of *Monsanto Chemical Co. v. Southern Natural Gas Co.*, 102 So.2d 223 (1958). In *Monsanto*, the plaintiff and defendants separately owned oil and gas leases which together covered a section consisting of 640 acres. The parties entered into pooling agreements integrating their interests in the section by which the plaintiff was to receive 11.15% of the working interest in the section and the defendants 88.85%. Subsequently, the Commissioner issued an order placing 126.4 acres covered by the defendants' leases into a separate unit upon which production was established. The plaintiff

10

sued to establish its rights to share 11.15% of the production attributed by virtue of the Commissioner's unit to the 126.4 acres under lease to the defendants. Defendant contended the agreements on which the plaintiff relied were inconsistent with and therefore superseded by the Commissioner's order insofar as the underlying 126.4 acres was concerned.

The Supreme Court adopted the position taken by Monsanto and held that the only thing involved was the judicial determination of the rights of the lessees who were joint operators and had no effect whatsoever upon the Commissioner's order. Pertinent to this appeal, the *Monsanto* case concluded that contractual rights not contrary to or inconsistent with the Commissioner's order were properly subject to judicial review in litigation between the contracting parties. It was argued in *Monsanto* that the plaintiff's suit therein was an impermissible collateral attack because it questioned the Commissioner's order and was filed prior to the plaintiff exhausting his administrative remedies. The supreme court rejected the contention that the plaintiff's action was an impermissible collateral attack on the Commissioner's order, holding it was beyond the functions and powers of the Commissioner of Conservation to say whether or not alleged contractual rights under the conventional agreements between the lessees were recast and affected by the order of the Commissioner, and this was a matter "that is clearly a function of the courts." *Id.* at 225.

Despite the arguments of Anglo-Dutch to the contrary, the Plaintiffs do not dispute the Commissioner's authority to issue the Allowable or that it should be applied as written. Instead they seek only that their rights under the lease, negotiated in concert with Anglo-Dutch, be acknowledged and maintained. We find no merit in Anglo-Dutch's contention that Plaintiffs' suit is an impermissible collateral attack requiring the Plaintiffs to exhaust all administrative remedies.

As to the merits of Plaintiffs' suit, we find it very persuasive that after granting the Allowable to Anglo-Dutch, the Commissioner's Order provided that the effective date of the Unit, which would then provide for the sharing of production on a unit-basis, to be October 30, 2012, *not* the date of first production. Clearly, the Commissioner could have made the effective date of the Unit the date of first production had he so desired. Plaintiffs seek only to enforce the Commissioner's unitization order as written and enforce the lease obligations the parties entered into.

Anglo-Dutch argues it had no choice but to produce the well in accordance with the allowable, and that it was caught in a "catch-22" situation. It maintains that any decision in this case to produce the well would have required it to pay "double royalties." We disagree.

After obtaining the allowable, Anglo-Dutch had the option to modify its contractual obligations to Plaintiffs under the mineral lease through a royalty escrow agreement. Plaintiffs note this is a common practice in the oil and gas industry which would have allowed Anglo-Dutch to escrow all royalties due from the pre-unitization production without having to pay what now amounts to "double royalties." Plaintiffs state they suggested just such an option to Anglo-Dutch. Thus, any argument that Plaintiffs would have not been amenable to executing a royalty escrow agreement and leaving Anglo-Dutch with only the option to shut in the well, rings hollow. Anglo-Dutch did not give Plaintiffs the option of executing a royalty escrow agreement and reached its own conclusion as to what Plaintiffs would have done if presented with that option.

In its apparent desire to immediately produce from the well, Anglo-Dutch chose to forego a royalty escrow agreement and produce under the allowable, and thus incurred an obligation to pay royalties to Plaintiffs as well as the adjoining landowners. The Commissioner's unitization order provided its effective date to

12

be October 30, 2012, which is the date when payment of royalties on a unit-basis was to begin. Prior to that date, we find the relationship between Anglo-Dutch and Plaintiffs was governed by the mineral lease between the parties. Therefore, Anglo-Dutch incurred concurrent obligations to pay lease-based royalties to Plaintiffs and unit-based royalties to the adjacent landowners. Anglo-Dutch could have modified the lease by entering into a royalty escrow agreement with Plaintiffs, but chose not to of its own volition.

## DECREE

For the reasons set forth above, we find the relationship between Anglo-Dutch and Plaintiffs prior to October 30, 2012, is governed by the bargained for lease between the two parties. Anglo-Dutch's obligation to pay Plaintiffs a one-fifth royalty on all production from the well is modified only upon the Commissioner's unitization order's effective date, October 30, 2012. The trial court's finding to the contrary is erroneous and hereby reversed. All costs below and on appeal are assessed against defendants, Anglo-Dutch Energy, L.L.C. and Anglo-Dutch (Everest), L.L.C.

**REVERSED.**