614 So.2d 409 (1993)
PACIFIC ENTERPRISES OIL COMPANY (USA)
v.
HOWELL PETROLEUM CORPORATION.
1910365.
Supreme Court of Alabama.
January 22, 1993.
*411 Rae M. Crowe, Duane A. Graham and Broox G. Holmes, Jr. of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, for appellant.
Thomas A. Carraway of Rives & Peterson, Birmingham, for appellee.
MADDOX, Justice.
This case concerns a dispute over how Pacific Enterprises Oil Company (USA) (formerly, Terra Resources, Inc.; hereinafter "Terra"[1]) should compute payment on Howell Petroleum Corporation's overriding royalty interest in oil and gas production from the Chadley 27-9 well in Fayette County, Alabama. Two issues are presented for our consideration. The first issue, an issue of apparent first impression in this State, is whether the trial court erred in holding that an Oil and Gas Board order "respacing" the land upon which Howell Petroleum's overriding royalty was computed had no effect on how Terra was contractually obligated to pay Howell Petroleum its overriding royalty. The second issue is whether an award of attorney fees pursuant to the Alabama Litigation Accountability Act (§ 12-19-270 et seq., Ala. Code 1975) was proper under the facts of this case.

Facts
Howell Petroleum owned or controlled approximately 75% of the oil and gas leases in Section 27 (Township 14 South, Range 11 West) in Fayette County, Alabama. Terra also owned or controlled certain oil and gas leases in Section 27 and wanted to drill for oil there. Because Howell Petroleum did not desire to develop its mineral leases, Howell and Terra negotiated a "farm out" agreement.[2] In the farm out agreement, Howell agreed to assign its leases in "the unit established for [the] Earning Well" to Terra after Terra explored and drilled an earning well. In exchange for this assignment of the oil and gas leases, Howell reserved to itself an overriding royalty interest in any oil and gas produced from "the unit established for the earning well." Howell's royalty interest was 27½% of the well's production before, and 40% after, "payout." "Payout" occurred when all the costs associated with drilling the well, except costs associated with drilling dry wells, were paid. The written "farm out" agreement was executed and signed by both Terra and Howell representatives in July 1986.
In September 1986, Terra applied for a drilling permit from the Oil and Gas Board for all of Section 27. Later that month, the Oil and Gas Board granted Terra's requested permit.
In October 1986, Terra executed a "Declaration of Unit" that was signed by all the working interest and royalty owners, including Howell Petroleum. The declaration established all of Section 27 as the *412 drilling or production unit. Also in October 1986, Terra drilled the Chadley 27-9 well, which, according to the farm out agreement, became the earning well. Soon thereafter, Howell assigned all its leases in Section 27 to Terra.
In December 1986, the Oil and Gas Board promulgated Order No. 86-287, which amended the special field rules for the Northeast Davis Chapel Field. Section 27 and the Chadley 27-9 well were productive extensions of the Northeast Davis Chapel Field. Order No. 86-287 allowed drilling or production units in the Northeast Davis Chapel Field to be 320-acres rather than 640 acres. Terra filed a motion asking the Board to reconsider this order, but later withdrew this request. Soon thereafter, Terra petitioned the Board for a 320-acre drilling or production unit for the Chadley 27-9 well. The Board granted Terra's petition, thus "respacing" Section 27 and creating two drilling or production units in the section: one in the eastern ½ and one in the western ½
Based on the success of the Chadley 27-9 well, both parties apparently believed that the western ½ would be productive. Also, there were apparently some concerns about the leases in the western ½ expiring unless a well was drilled. Terra attempted to drill two wells in the western ½ of Section 27. Both wells were dry holes.
In January 1987, Terra executed a new "Declaration of Unit" designating the eastern ½ of Section 27 as the drilling or production unit for the Chadley 27-9 well. Howell Petroleum's representatives specifically refused to sign this second declaration.
In August 1987, Terra sent out division orders to its working interest, royalty, and overriding royalty interest owners. Terra computed Howell Petroleum's overriding royalty interest on a 320-acre basis, that is, on the basis of the drilling or production unit established for the eastern ½ of Section 27. Howell specifically protested this computation scheme in a letter dated August 25, 1987. When Terra refused to change the computation method, Howell sued.
Howell sought a judgment declaring that its overriding royalty interest should be computed on a 640-acre basis (i.e, on the original drilling or production unit designation for all of Section 27) in the future and compensation for alleged past underpayment. Also, Howell requested costs and attorney fees.
In its answer, and indeed throughout all the proceedings at the trial level, Terra contended that the Board's "respacing" of Section 27 superseded or amended its agreement with Howell as to Howell's overriding royalty. Terra argued that the Board's order creating two drilling or production units for Section 27 altered the computation for Howell Petroleum's overriding royalty based on the agreement itself. Also, or alternatively, Terra argued that the Board's "respacing" meant that royalties and overriding royalties had to be paid strictly on the two newly established drilling or production units. To do otherwise, Terra argued, would dilute the correlative rights of other interest holders in each newly established unit.
After discovery, both parties moved for summary judgment. The trial court granted a summary judgment for Howell Petroleum. Terra appealed to this Court, but then sought, and was granted, leave to file a motion for relief from judgment in the trial court.
Terra then filed a Rule 60(b), Ala.R.Civ. P., motion in the trial court based on "new matters and newly discovered evidence." Specifically, Terra noted that it had failed to cite the trial court to various cases from other jurisdictions that might be pertinent to the case. Also, Terra asserted that it had newly discovered evidence concerning Howell's knowledge of its petition for the Board to "respace" Section 27, of the Board's order, and of other pertinent matters. The trial court granted Terra's Rule 60(b) motion and set the case for trial.
After hearing the evidence, the trial court made extensive findings of fact and conclusions of law and concluded that the farm out agreement and the initial declaration of unit constituted a written contract. Further, the court found that Howell, in *413 assigning its leases in Section 27, had fulfilled its part of the bargain. Additionally, the trial court found that the declaration of unit was a voluntary pooling agreement that became an integral part of the contract. Importantly, the court held that the Board's "respacing" of Section 27 into two 320-acre drilling or production units did not change the underlying contract between Terra and Howell. The court entered a judgment awarding Howell Petroleum $90,236.18, plus interest, for past underpayment and declaring that, in the future, Terra was to compute Howell's overriding royalty payments on a 640-acre unit of measure.
In an amended judgment, the trial court found that Terra had filed the Rule 60(b) motion for relief from judgment merely to impose delay and without substantial justification. Specifically, the trial court found that Terra failed to proffer any newly discovered evidence at trial or to otherwise justify its motion for relief from judgment. The court did not award any specific amount for attorney fees before Terra appealed.

I. The Unit of Measure Issue
Initially, Terra argues that other oil and gas producing jurisdictions hold that a valid order of the Oil and Gas Board, or those States' functional equivalents, supersedes or amends royalty or overriding royalty agreements based on a voluntary spacing or pooling declaration. Terra cites Hladik v. Lee, 541 P.2d 196 (Okla.1975), Humble Oil & Refining Co. v. Jones, 125 So.2d 640, (La.App.1961), annulled and remanded, 241 La. 661, 130 So.2d 408, aff'd on rehearing, 157 So.2d 110 (La.App.1968), Fletcher v. Ricks Exploration, 905 F.2d 890 (5th Cir.1990), and 4 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 48.3(k) (1990), in support of this contention.
In response, Howell Petroleum argues the distinction between spacing and pooling. Under Alabama statutes, both spacing and pooling may be either voluntary or compulsory. See, §§ 9-17-12(b) and 9-17-13(a), Ala.Code 1975. According to Howell, compulsory spacing, or compulsorily establishing a drilling or production unit under § 9-17-12(b), Ala.Code 1975, is merely a conservation measure that has no effect on royalty payments. Howell apparently concedes, however, that compulsory pooling, or compulsorily integrating interests into a drilling or production unit under § 9-17-13(a) does affect royalty payments.
After carefully reading the cited authorities, we conclude that "respacing" by the Board does not affect a prior royalty agreement, unless the agreement explicitly makes, or can reasonably be interpreted to make, royalty computations dependent on spacing by the Board.[3] Also, we agree *414 with Howell that compulsory or forced pooling under § 9-17-13 does affect prior royalty agreements. See, Humble Oil & Refining, 125 So.2d at 646-47, aff'd on rehearing, 157 So.2d at 112.[4]
In Jones v. Bronco Oil & Gas Co., 446 So.2d 611, 613 n. 3 (Ala.1984), this Court stated:
"In passing, we note our agreement with the view of the Supreme Court of Louisiana that the orders of the regulatory authority charged with the responsibility of preventing waste of the state's oil and gas `supersede, supplement, replace, and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. [And,] that these orders become the law as between the parties in determining their respective rights and obligations.' Delatte v. Woods, 232 La. [341] at 357, 94 So.2d [281] at 287 (1957)."
We reaffirm our statement in Bronco Oil. However, implicitly, for a Board order to "supersede or supplement" a provision in a private contract the Board order and the contractual provision must conflict. See, Arkansas Louisiana Gas Co. v. Southwestern Natural Production Co., 221 La. 608, 609, 60 So.2d 9, 10 (1952). We conclude that the Board order at issue here does not address royalty payments, and, thus, cannot conflict with the private contractual agreement between Terra and Howell Petroleum.
However, we agree with Terra's second argument that the agreement between it and Howell Petroleum, by its very terms, made computation of Howell's overriding royalty dependent on spacing by the Board.[5] We conclude that the trial court erred in making its legal determination that the agreement between Howell and Terra was not affected by the Board's order.
It is well settled that "two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together in construing the contract." Haddox v. First Alabama Bank of Montgomery, N.A., 449 So.2d 1226, 1229 (Ala.1984). Whether an agreement is ambiguous is a legal question for the court. Terry Cove North, Inc. v. Baldwin County Sewer Authority, Inc., 480 So.2d 1171, 1173 (Ala.1985). If an agreement is found to be unambiguous, the court then has the duty to determine the meaning of the agreement. Id. The trial court should give the terms of the agreement their clear and plain meaning. Id. Further, the court should presume that the parties intended what the terms of the agreement clearly state. Id.
We agree with the trial court that the farm out agreement, the initial unit declaration, and the assignment of leases formed a binding contract between Howell and Terra. We disagree, however, with the trial court's legal conclusion that this agreement was not affected by the Board's "respacing" order.
The farm out agreement states, in pertinent part:
"V. Assignment

"If the Test Well, or substitute therefor, is drilled within the time and manner and to the depth specified herein, and if such well, hereinafter sometimes called the `Earning Well,' is completed as a producer of oil and/or gas in commercial quantities, and upon Terra's written request, Howell agrees to execute and deliver an assignment to Terra, without warranty of title either express or implied, *415 of all Howell's rights, title and interest in and to the Farmout Lands subject to this agreement insofar and only insofar as such portions of the Farmout Lands are included within the geographical boundaries of the unit established for said Earning Well."

(Plaintiff's Exhibit 1 at p. 2; Supp.R. at 4; emphasis supplied.)
The Declaration of Unit states, in pertinent part:
"WHEREAS, the undersigned, having full authority in and under the oil, gas and mineral leases described in Exhibit `A' and embraced within the followingdescribed unit, consider it necessary and advisable to pool, consolidate, and combine the lands covered by said leases, and in order to comply with orders prescribed by the Oil and Gas Board of Alabama and to establish as a drilling, operating and producing unit the land hereinbelow described;
"NOW THEREFORE, in accordance with the power and authority granted by the leases described in Exhibit `A' and in consideration of the premises, the undersigned do hereby pool, combine and consolidate the oil, gas and mineral leases and interests described in Exhibit `A,' and the lands and acreage covered thereby so as to constitute and establish the following described lands as a drilling or production unit for the development, production and transportation of oil, gas, gas condensate and other gaseous hydrocarbons, to wit:
"TRI/Chadley 27-9
All Section 27-14S-11W
Fayette County, Alabama
"There is hereby pooled and combined, into the area described above, all the leasehold, mineral, overriding royalty, and royalty interests and all other interests in the above-described unit as to which the undersigned (or any of the undersigned) have the right to pool and combine into the unit created hereby whether or not said leases and other interests are particularly described herein. Said unit is subject to the rules, regulations, and orders of the Oil and Gas Board of Alabama, and such pooled unit shall, unless sooner terminated by the parties hereto, remain in full force and effect until the leases described in Exhibit `A' have terminated by their own terms and provision."
(Plaintiff's Exhibit 5 at p. 1; Supp.R. at 20; emphasis supplied.)
The basic legal question that the trial court had to answer was what was meant by "the unit established for said Earning Well." Neither party contests that the "earning well" was the Chadley 27-9. Clearly, initially the "unit established" for the Chadley 27-9 was the voluntarily created unit consisting of all 640 acres in Section 27. However, the declaration of unit clearly was made subject to "the rules, regulations, and orders of the Oil and Gas Board of Alabama." Therefore, when the Board "respaced" Section 27 and created two drilling or production units, the "unit established" for the Chadley 27-9 became the eastern ½ of Section 27. No other reasonable interpretation can come from the clear and plain meaning of the terms of the agreement. The trial court erred in interpreting the plain language of the agreement.

II. The Attorney Fees Issue
After granting Terra's Rule 60(b) motion and hearing evidence from both parties, the trial court determined that Terra had filed the Rule 60(b) motion and put Howell through a trial "without substantial justification." In its amended judgment, the trial court stated:
"The Court and parties had to go through a trial of this case because [Terra], in connection with its Rule 60(b) motion, represented that it had new matters of a material nature that should have been presented at the hearing on summary judgment, but were not. Based upon these representations, the case was reopened, and trial required. The Court noted at trial that none of the `new matter' *416 promised in [Terra's] Rule 60(b) motion had been presented. The Court now finds and concludes, after [a] hearing on the attorney fees issues, that no material new matters were presented by [Terra] at the trial; and that trial was required on defenses and a counterclaim which were without substantial justification within the meaning of the [Litigation] Accountability Act. Thus, [Howell] is entitled to an award of attorney fees under the Accountability Act."
(Vol. 6 R. at 795.)
At the parties' mutual request, however, the trial court deferred making an award of attorney fees, and it had made no award of attorney fees before Terra appealed the judgment to this Court.
Terra argues that the trial court incorrectly determined that it acted "without substantial justification" in filing and pursuing its Rule 60(b) motion. Further, Terra argues that the trial court implicitly found merit in its Rule 60(b) motion when it granted the motion.
Ala.Code 1975, § 12-19-271(1), provides:
"The phrase `without substantial justification,' when used with reference to any action, claim, defense or appeal, including without limitation any motion, means that such action, claim, defense or appeal (including any motion) is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation, as determined by the court."
On the other hand, Howell argues that the trial court's grant of Terra's Rule 60(b) motion should not be taken as a showing of implicit merit. Also, Howell stresses that Terra failed to prove the new claims and defenses set forth in its Rule 60(b) motion at trial, and that, therefore, the trial court correctly determined that the motion was "without substantial justification."
Our research reveals no prior cases in exactly the same posture as this one. Initially, then, we must determine what our standard of review will be.
We find the federal model under Rule 11, Fed.R.Civ.P., to be persuasive in determining our standard of appellate review. We note that the legislature, in defining "without substantial justification," used terms virtually synonymous with those Congress used in defining the certification standard[6] in Rule 11.
Viewing the two definitions sideby-side illustrates their remarkable similarity.
Rule 11, Fed.R.Civ.P., states, in pertinent part:
"The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."
The certification standard was added to federal Rule 11 in 1983. See, 5A Charles Allen Wright and Arthur R. Miller, Federal Practice and Procedure § 1331 (1990). Because the legislature enacted the Litigation Accountability Act in 1987, the striking similarity of language cannot be an accident. Based on the striking similarity between the definition of "without substantial justification" and the certification standard *417 in Rule 11, we conclude that the legislature intended for the "without substantial justification" determination to serve the same purpose as the certification standard.
In Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990), the United States Supreme Court stated:

"It is now clear that the central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rule Enabling Act's grant of authority, streamline the administration and procedure of the federal courts.... Although the Rule must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy, ... any interpretation must give effect to the Rule's central goal of deterrence."

(Emphasis supplied.) See, also, Business Guides, Inc. v. Chromatic Communications Enter., Inc., 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).
If the central purpose of Rule 11 is to "deter baseless filings in district court," it stands to reason that the certification standard serves the same purpose. We conclude that the legislature intended to accomplish the same purpose through the "without substantial justification" determination. See, Robert D. Hunter, Alabama's 1987 Tort Reform Legislation, 18 Cumb. L.Rev. 281 (1988), and 5A Charles Allen Wright and Arthur R. Miller, Federal Practice and Procedure § 1335 (1990).
Because the underlying purposes of the certification standard and the "without substantial justification" determination are the same, and because the language used in each is synonymous, we look to federal case law construing Rule 11 for guidance in determining our standard of appellate review. Cooter & Gell, supra, is the latest statement from the United States Supreme Court on appellate review of a district court's Rule 11 determination.
In Cooter & Gell, the United States Supreme Court held that federal appellate courts should apply an "abuse of discretion" standard to all aspects of a district court's Rule 11 determination. According to the Court, this standard calls for (1) a determination that the district court did not apply an erroneous view of the law, and (2) a determination that the district court did not erroneously assess the evidence. See also, Davis v. Carl, 906 F.2d 533 (11th Cir.1990), as an example of how the 11th Circuit Court of Appeals applies Cooter & Gell.
Section 12-19-272(a), Ala.Code 1975, requires a trial court to determine that an action, claim or defense is "without substantial justification" before it can assess attorney fees against the party or attorney (or both) asserting the action, claim, or defense.[7] We conclude that this determination may be either a factual or a legal determination, depending on the grounds upon which the trial court bases its determination.
Section 12-19-271(1), Ala.Code 1975 states:
"The phrase `without substantial justification,' when used with reference to any action, claim, defense or appeal, including without limitation any motion, means that such action, claim, defense or appeal (including any motion) is frivolous, groundless in fact or in law, or vexatious, or interposed for any improper purpose, including without limitation, to cause unnecessary delay or needless increase in the cost of litigation, as determined by the court."
(Emphasis supplied.)
*418 The clear terms of § 12-19-271(1) require that for an action, claim, or defense to be "without substantial justification" it must be either "frivolous," "groundless in fact," "groundless in law," "vexatious," or "interposed for any improper purpose." We conclude that the terms or phrases "frivolous," "groundless in fact," "vexatious," and "interposed for any improper purpose" require factual determinations that will be entitled to deference on appeal. See, Smith v. Smith, 551 So.2d 1024 (Ala.1989). Thus, if a trial court determines that a party's action, claim, or defense is "without substantial justification," based on the applicability of any one of these terms or phrases, that determination will not be disturbed on appeal "unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence." Cove Creek Development Corp. v. APAC-Alabama, Inc., 588 So.2d 458, 461 (Ala.1991).
However, we conclude that the phrase "groundless in law" clearly calls for a legal determination. Therefore, if the trial court determines that a party's action, claim, or defense is "without substantial justification" because it is "groundless in law," that determination will not be entitled to a presumption of correctness. Rather, the appellate courts of this State will test the validity of the trial court's legal conclusion.
Also, we conclude that the legislature had no intention to chill attorney creativity in making good faith arguments for changes in the law. Trial courts should be exceedingly careful in making a "without substantial justification" finding, so as not to discourage attorneys from creatively arguing for change in the law based on rational, good faith argument.
Additionally, we will require a trial court making the "without substantial justification" determination to make its determination, the ground or grounds upon which it relies, and the legal or evidentiary support for its determination, a part of the record, either by drafting a separate written order or by having these findings transcribed for the official record. This process will aid the appellate courts of this State during review.[8]
In this case, we cannot determine upon what basis, or upon what legal or evidentiary points, the trial court based its determination that Terra's asserted Rule 60(b) "new matters" were "without substantial *419 justification." Accordingly, we reverse the trial court's determination that the motion was filed "without substantial justification," and we remand the cause to the trial court for written or transcribed findings, as mandated above. Also, the trial court is instructed, should it decide on remand to make a determination that the motion was filed "without substantial justification," to set forth its reasoning, based on the factors enumerated in § 12-19-273. See, A & M Grocery, Inc. v. Lopez, 567 So.2d 261 (Ala.1990).
Based on the foregoing, we reverse the judgment of the trial court and remand this cause for action consistent with this opinion.
ISSUE I: REVERSED AND REMANDED.
ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
ISSUE II: REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, ADAMS, HOUSTON and INGRAM, JJ., concur specially.
ADAMS, Justice (concurring specially as to Issue II).
I concur with the majority opinion both as to Issue I and Issue II, but in regard to Issue II, I write specially to point out that Rule 11 of the Federal Rules of Civil Procedure is presently under considerable discussion and revision. Inasmuch as our treatment of the Litigation Accountability Act is patterned after Rule 11, it is worthwhile to discuss ways in which Rule 11 will be changed, and the notes of the Advisory Committee on Civil Rules of the United States Judicial Conference as to how federal district courts should implement these changes.[9]
The principal purpose of Rule 11, which is to discourage frivolous lawsuits, is being retained. However, the means by which that purpose is attained is not being retained.
It is significant that prior to 1983, when Rule 11 was amended, only a few Rule 11 decisions had been reported, but that after the amendment and the appointment of Republican judges by Presidents Reagan and Bush, over 600 Rule 11 decisions have been reported. See, Georgene M. Vairo, Rule 11: A Critical Analysis, 118 F.R.D. 189 (1988), and Eric K. Yamamoto and Danielle K. Hart, Rule 11 and State Courts: Panacea or Pandora's Box?, 41 Def.L.J. 185 (1992).
The rule has been criticized as having a chilling effect on public interest attorneys filing novel and innovative lawsuits in the interest of the public. Such lawyers and law firms are hesitant to file such lawsuits when faced with the possibility of large monetary sanctions. Usually, such law firms are assisted by national organizations, such as the NAACP, the Sierra Club, and Legal Aid Services, whose resources are obtained from public and foundation support.
The committee comments discuss at great length the need for flexibility in the imposition not only of monetary sanctions, but sanctions of any description. For the benefit of the bench and bar, I am including in this concurring opinion the committee's recommendation for the change of Rule 11, as well as its comments, which are due to go before the United States Supreme Court and the United States Congress this year for approval and adoption *420 as the law on an attorney's responsibility with reference to motions, pleadings, and conduct of litigation in the federal system.
Inasmuch as the majority opinion is based on Rule 11, the federal counterpart of our Litigation Accountability Act, it will be good for us to take into consideration how the federal system will probably handle Rule 11 in the future. Even if the United States Supreme Court and Congress do not adopt all these changes, I think that these changes are good and should be considered by our courts in implementing our Litigation Accountability Act, which, to some extent, parallels Rule 11.
The proposed new Rule 11, with comments, is as follows:
"Rule 11. Signing of Pleadings, Motions, and Other Papers; Representations to Court: Sanctions
"(a) Signature. Every pleading, written motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party. whose address shall bo stated. A party who is not represented by an attorney shall sign the party's pleading, motion, or other paper and state the party's address Each paper shall state the signer's address and telephone number, if any. Except when otherwise specifically provided by rule or statute, pleadings need not be verified or accompanied by affidavit. The rule in equity that the averments of an answer under oath must be overcome by the testimony of two witnesses or of one witness sustained by corroborating circumstances is abolished. The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper, that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warrented by existing law, or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improver purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, of other An unsigned paper is not signed, it shall be stricken unless it is signed promptly after the omission of the signature is corrected promptly after being called to the attention of the pleader or movant attorney or party.
"(b) Representations to Court. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
"(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
"(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
"(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
"(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

*421 "(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
"(1) How Initiated.
"(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.
"(B) On Court's Initiative. On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.
"(2) Nature of Sanction: Limitations. A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses in curred as a direct result of the violation.
"(A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).
"(B) Monetary sanctions may not be awarded on the court's initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party which is, or whose attorneys are, to be sanctioned.
"(3) Order. When imposing sanctions, the court shall describe the conduct determined to constitute a violation of this rule and explain the basis for the sanction imposed.
"(d) Inapplicability to Discovery. Subdivisions (a) through (c) of this rule do not apply to disclosures and discovery requests, responses, objections, and motions that are subject to the provisions of Rules 26 through 37.
"COMMITTEE NOTES
"Purpose of revision. This revision is intended to remedy problems that have arisen in the interpretation and application of the 1983 revision of the rule. For empirical examination of experience under the 1983 rule, see, e.g., New York State Bar Committee on Federal Courts, Sanctions and Attorneys' Fees (1987); T. Willging, The Rule 11 Sanctioning Process (1989); American Judicature Society, Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11 (S. Burbank ed., 1989); E. Wiggins, T. Willging, and D. Stienstra, Report on Rule 11 (Federal Judicial Center 1991). For book-length analyses of the case law, see G. Joseph, Sanctions: The Federal Law of Litigation Abuse (1989); J. Solovy, The Federal Law of Sanctions (1991); G. Vairo, Rule 11 Sanctions: Case Law Perspectives and Preventive Measures (1991).
"The rule retains the principle that attorneys and pro se litigants have an obligation to the court to refrain from conduct that frustrates the aims of Rule 1. The revision broadens the scope of this *422 obligation, but places greater constraints on the imposition of sanctions and should reduce the number of motions for sanctions presented to the court. New subdivision (d) removes from the ambit of this rule all discovery requests, responses, objections, and motions subject to the provisions of Rule 26 through 37.
"Subdivision (a). Retained in this subdivision are the provisions requiring signatures on pleadings, written motions, and other papers. Unsigned papers are to be received by the Clerk, but then are to be stricken if the omission of the signature is not corrected promptly after being called to the attention of the attorney or pro se litigant. Correction can be made by signing the paper on file or by submitting a duplicate that contains the signature. A court may require by local rule that papers contain additional identifying information regarding the parties or attorneys, such as telephone numbers to facilitate facsimile transmissions, though, as for omission of a signature, the paper should not be rejected for failure to provide such information.
"The sentence in the former rule relating to the effect of answers under oath is no longer needed and has been eliminated. The provision in the former rule that signing a paper constitutes a certificate that it has been read by the signer also has been eliminated as unnecessary. The obligations imposed under subdivision (b) obviously require that a pleading, written motion, or other paper be read before it is filed or submitted to the court.
"Subdivisions (b) and (c). These subdivisions restate the provisions requiring attorneys and pro se litigants to conduct a reasonable inquiry into the law and facts before signing pleadings, written motions, and other documents, and prescribing sanctions for violation of these obligations. The revision in part expands the responsibilities of litigants to the court, while providing greater constraints and flexibility in dealing with infractions of the rule. The rule continues to require litigants to `stop-and-think' before initially making legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable and by generally providing protection against sanctions if they withdraw or correct contentions after a potential violation is called to their attention.
"The rule applies only to assertions contained in papers filed with or submitted to the court. It does not cover matters arising for the first time during oral presentations to the court, when counsel may make statements that would not have been made if there had been more time for study and reflection. However, a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit. For example, an attorney who during a pretrial conference insists on a claim or defense should be viewed as `presenting to the court' that contention and would be subject to the obligations of subdivision (b) measured as of that time. Similarly, if after a notice of removal is filed, a party urges in federal court the allegations of a pleading filed in state court (whether as claims, defenses, or in disputes regarding removal or remand), it would be viewed as `presenting'and hence certifying to the district court under Rule 11those allegations.
"The certification with respect to allegations and other factual contentions is revised in recognition that sometimes a litigant may have good reasons to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation. Tolerance of factual contentions in initial pleadings by plaintiffs or defendants when specifically identified as made on information and belief does not relieve litigants from the obligation *423 to conduct an appropriate investigation into the facts that is reasonable under the circumstances; it is not a license to join parties, make claims, or present defenses without any factual basis or justification. Moreover, if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention. Subdivision (b) does not require a formal amendment to pleadings for which evidentiary support is not obtained, but rather calls upon a litigant not thereafter to advocate such claims or defenses.
"The certification is that there is (or likely will be) `evidentiary support' for the allegation, not that the party will prevail with respect to its contention regarding the fact. That summary judgment is rendered against a party does not necessarily mean, for purposes of this certification, that it had no evidentiary support for its position. On the other hand, if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient `evidentiary support' for purposes of Rule 11.
"Denials of factual contentions involve somewhat different considerations. Often, of course, a denial is premised upon the existence of evidence contradicting the alleged fact. At other times a denial is permissible because, after an appropriate investigation, a party has no information concerning the matter or, indeed, has a reasonable basis for doubting the credibility of the only evidence relevant to the matter. A party should not deny an allegation it knows to be true; but it is not required, simply because it lacks contradictory evidence, to admit an allegation that it believes is not true.
"The changes in subdivisions (b)(3) and (b)(4) will serve to equalize the burden of the rule upon plaintiffs and defendants, who under Rule 8(b) are in effect allowed to deny allegations by stating that from their initial investigation they lack sufficient information to form a belief as to the truth of the allegation. If, after further investigation or discovery, a denial is no longer warranted, the defendant should not continue to insist on that denial. While sometimes helpful, formal amendment of the pleadings to withdraw an allegation or denial is not required by subdivision (b).
"Arguments for extensions, modifications, or reversals of existing law or for creation of new law do not violate subdivision (b)(2) provided they are `nonfrivolous.' This establishes an objective standard, intended to eliminate any `emptyhead pure-heart' justification for patently frivolous arguments. However, the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether paragraph (2) has been violated. Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule.
"The court has available a variety of possible sanctions to impose for violations, such as striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; referring the matter to disciplinary authorities (or, in the case of government attorneys, to the Attorney General, Inspector General, or agency head), etc. See Manual for Complex Litigation, Second, § 42.3. The rule does not attempt to enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances; but, for emphasis, it does specifically note that a sanction may be nonmonetary as well as monetary. Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person *424 has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants: all of these may in a particular case be proper considerations. The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons.
"Since the purpose of Rule 11 sanctions is to deter rather than to compensate, the rule provides that, if a monetary sanction is imposed, it should ordinarily be paid into court as a penalty. However, under unusual circumstances, particularly for (b)(1) violations, deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation. Accordingly, the rule authorizes the court, if requested in a motion and if so warranted, to award attorney's fees to another party. Any such award to another party, however, should not exceed the expenses and attorneys' fees for the services directly and unavoidably caused by the violation of the certification requirement. If, for example, a wholly unsupportable count were included in a multi-count complaint or counterclaim for the purpose of needlessly increasing the cost of litigation to an impecunious adversary, any award of expenses should be limited to those directly caused by inclusion of the improper count, and not those resulting from the filing of the complaint or answer itself. The award should not provide compensation for services that could have been avoided by an earlier disclosure of evidence or an earlier challenge to the groundless claims or defenses. Moreover, partial reimbursement of fees may constitute a sufficient deterrent with respect to violations by persons having modest financial resources. In cases brought under statutes providing for fees to be awarded to prevailing parties, the court should not employ cost-shifting under this rule in a manner that would be inconsistent with the standards that govern the statutory award of fees, such as stated in Christiansburg Garment Co. v. EEOC, 434 U.S. 412 [98 S.Ct. 694, 54 L.Ed.2d 648] (1978).
"The sanction should be imposed on the personswhether attorneys, law firms, or partieswho have violated the rule or who may be determined to be responsible for the violation. The person signing, filing, submitting, or advocating a document has a nondelegable responsibility to the court, and in most situations is the person to be sanctioned for a violation. Absent exceptional circumstances, a law firm is to be held also responsible when, as a result of a motion under subdivision (c)(1)(A), one of its partners, associates, or employees is determined to have violated the rule. Since such a motion may be filed only if the offending paper is not withdrawn or corrected within 21 days after service of the motion, it is appropriate that the law firm ordinarily be viewed as jointly responsible under established principles of agency. This provision is designed to remove the restrictions of the former rule. Cf. Pavelic & LeFlore v. Marvel Entertainment Group, 493 U.S. 120 [110 S.Ct. 456, 107 L.Ed.2d 438] (1989) (1983 version of Rule 11 does not permit sanctions against law firm of attorney signing groundless complaint).
"The revision permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation. When appropriate, the court can make an additional inquiry in order to determine whether the sanction should be imposed on such persons, firms, or parties either *425 in addition to or, in unusual circumstances, instead of the person actually making the presentation to the court. For example, such an inquiry may be appropriate in cases involving governmental agencies or other institutional parties that frequently impose substantial restrictions on the discretion of individual attorneys employed by it.
"Sanctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for causing a violation of subdivision (b)(2), involving frivolous contentions of law. Monetary responsibility for such violations is more properly placed solely on the party's attorneys. With this limitation, the rule should not be subject to attack under the Rules Enabling Act. See Willy v. Coastal Corp., [___] U.S. [____, 112 S.Ct. 1076, 117 L.Ed.2d 280] (1992); Business Guides, Inc. v. Chromatic Communications Enter. Inc., [498] U.S. [533, 111 S.Ct. 922, 112 L.Ed.2d 1140] (1991). This restriction does not limit the court's power to impose sanctions or remedial orders that may have collateral financial consequences upon a party, such as dismissal of a claim, preclusion of a defense, or preparation of amended pleadings.
"Explicit provision is made for litigants to be provided notice of the alleged violation and an opportunity to respond before sanctions are imposed. Whether the matter should be decided solely on the basis of written submissions or should be scheduled for oral argument (or, indeed, for evidentiary presentation) will depend on the circumstances. If the court imposes a sanction, it must, unless waived, indicate its reasons in a written order or on the record; the court should not ordinarily have to explain its denial of a motion for sanctions. Whether a violation has occurred and what sanctions, if any, to impose for a violation are matters committed to the discretion of the trial court; accordingly, as under current law, the standard for appellate review of these decisions will be for abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 [110 S.Ct. 2447, 110 L.Ed.2d 359] (1990) (noting, however, that an abuse would be established if the court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence).
"The revision leaves for resolution on a case-by-case basis, considering the particular circumstances involved, the question as to when a motion for violation of Rule 11 should be served and when, if filed, it should be decided. Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely. In other circumstances, it should not be served until the other party has had a reasonable opportunity for discovery. Given the `safe harbor' provisions discussed below, a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).
"Rule 11 motions should not be made or threatened for minor, inconsequential violations of the standards prescribed by subdivision (b). They should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes. Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, to exact an unjust settlement, to intimidate an adversary into withdrawing contentions that are fairly debatable, to increase the costs of litigation, to create a conflict of interest between attorney and client, or to seek disclosure of matters otherwise protected by the attorneyclient privilege or the work-product doctrine. As under the prior rule, the court may defer its ruling (or its decision as to the identity of the persons to be sanctioned) until final resolution of the case in order to avoid immediate conflicts of interest and to reduce the disruption created if a disclosure of attorney-client communications is needed to determine whether a violation occurred or to identify the person responsible for the violation.

*426 "The rule provides that requests for sanctions must be made as a separate motion, i.e., not simply included as an additional prayer for relief contained in another motion. The motion for sanctions is not, however, to be filed until at least 21 days (or such other period as the court may set) after being served. If, during this period, the alleged violation is corrected, as by withdrawing (whether formally or informally) some allegation or contention, the motion should not be filed with the court. These provisions are intended to provide a type of `safe harbor' against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation. Under the former rule, parties were sometimes reluctant to abandon a questionable contention lest that be viewed as evidence of a violation of Rule 11; under the revision, the timely withdrawal of a contention will protect a party against a motion for sanctions.
"To stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, the revision provides that the `safe harbor' period begins to run only upon service of the motion. In most cases, however, counsel should be expected to give informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion.
"As under former Rule 11, the filing of a motion for sanctions is itself subject to the requirement of the rule and can lead to sanctions. However, service of a cross motion under Rule 11 should rarely be needed since under the revision the court may award to the person who prevails on a motion under Rule 11whether the movant or the target of the motionreasonable expenses, including attorney's fees, incurred in presenting or opposing the motion.
"The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order. This procedure provides the person with notice and an opportunity to respond. The revision provides that a monetary sanction imposed after a court-initiated show cause order be limited to a penalty payable to the court and that it be imposed only if the show cause order is issued before any voluntary dismissal or an agreement of the parties to settle the claims made by or against the litigant. Parties settling a case should not be subsequently faced with an unexpected order from the court leading to monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case. Since show cause orders will ordinarily be issued only in situations that are akin to a contempt of court, the rule does not provide a `safe harbor' to a litigant for withdrawing a claim, defense, etc., after a show cause order has been issued on the court's own initiative. Such corrective action, however, should be taken into account in deciding whatif anysanction to impose if, after consideration of the litigant's response, the court concludes that a violation has occurred.
"Subdivision (d). Rules 26(g) and 37 establish certification standards and sanctions that apply to discovery disclosures, requests, responses, objections, and motions. It is appropriate that Rules 26 through 37, which are specially designed for the discovery process, govern such documents and conduct rather than the more general provisions of Rule 11. Subdivision (d) has been added to accomplish this result.
"Rule 11 is not the exclusive source for control of improper presentations of claims, defenses, or contentions. It does not supplant statutes permitting awards of attorney's fees to prevailing parties or alter the principles governing such awards. It does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under 28 U.S.C. § 1927. See *427 Chambers v. NASCO, [___] U.S. [____, 111 S.Ct. 2123, 115 L.Ed.2d 27] (1991). Chambers cautions, however, against reliance upon inherent powers if appropriate sanctions can be imposed under provisions such as Rule 11, and the procedures specified in Rule 11notice, opportunity to respond, and findingsshould ordinarily be employed when imposing a sanction under the court's inherent powers. Finally, it should be noted that Rule 11 does not preclude a party from initiating an independent action for malicious prosecution or abuse of process."
HORNSBY, C.J., and SHORES, HOUSTON and INGRAM, JJ., concur.
NOTES
[1] Terra Resources, Inc., merged with and changed its name to Pacific Enterprises Oil Company (USA) sometime after all the pertinent events in this case. (Vol. 6 R., Trial Transcript at 126.) Because at trial the court and the attorneys referred to Pacific as Terra, and because all the pertinent documents refer to Pacific as Terra, for convenience we will refer to Pacific as Terra.
[2] A "farm out" agreement is defined as "A very common form of agreement between operators, whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it (in common or in severalty) to another operator who is desirous of drilling the tract. The assignor in such a deal may or may not retain an overriding royalty or production payment. The primary characteristic of the farm out is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to completion of the transfer to him." Howard Williams and Charles Meyers, Manual of Oil and Gas Terms 262 (5th ed. 1981).
[3] Terra cites Hladik in support of its contention that "respacing" by the Board supersedes prior royalty agreements between private parties. We find Hladik distinguishable in that the leases involved in Hladik contained provisions that made royalty computations dependent on spacing by the Oklahoma Corporate Commission (the functional equivalent of Alabama's Oil and Gas Board).

In Hladik, an oil and gas lessee voluntarily pooled numerous oil and gas leases and created a voluntarily declared 480-acre drilling or production unit. Id. at 197. The Corporate Commission then ordered that all drilling or production units within the field consist of 160 acres. Id.
Importantly, each lease involved in Hladik provided that each lessor "[would] receive only such proportion of royalty stipulated in [the] lease as lessor's acreage in [the] unit [bore] to [the] total acreage in [the] unit." Id. Also, the Corporate Commission's order specifically provided:
"`That all royalty interest within any spacing unit created herein shall be communitized and each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that the acreage owned by him bears to the total acreage in the unit.'"
Id. at 197.
The Oklahoma Supreme Court concluded that the Corporate Commission's drilling or production unit superseded the voluntarily declared drilling or production unit. Id. at 199. The Court held that, pursuant to the royalty provisions in the leases and the intent implied by those provisions, royalty payments were properly made on the basis of the Commission's 160-acre drilling or production unit. Id.
[4] Humble Oil can be read as holding that an order of the Commissioner of Conservation compulsorily pooling leases into a drilling or production unit supersedes a voluntarily established unit and amends prior royalty agreements, unless the parties established "a specific and positive intention to freeze the old [voluntarily created] unit." 125 So.2d at 646.
[5] We note that Howell makes much of the asserted fact that Terra pays itself based on a 640-acre unit of measure while paying Howell based on a 320-acre unit. Our review of the record reveals that this assertion mischaracterizes the facts. (See, Vol. 7 R.; Trial Transcript at 245-57, 255-56, 317, 330-32.)
[6] See, 5A Charles Allen Wright and Arthur R. Miller, Federal Practice and Procedure § 1335 (1990) (Professors Wright and Miller use the term "standard of certification" to refer to the fifth sentence in Rule 11).
[7] Section 12-19-272(a), Ala.Code 1975 states:

"Except as otherwise provided in this article, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorneys' fees and costs against any attorney or party, or both, who has brought a civil action, or asserted a claim therein, or interposed a defense, that a court determines to be without substantial justification, either in whole or in part."
(Emphasis supplied.)
[8] Justice Adams has obtained proposed amendments to Federal Rule 11, which, if approved by the United States Supreme Court and adopted by the Congress, will make substantial changes in that rule. In his special concurrence, Justice Adams includes the full text of those proposed amendments "for the benefit of the bench and bar." Also, he says:

"Inasmuch as the majority opinion is based on Rule 11, the federal counterpart of the Litigation Accountability Act, it will bode well for us to take into consideration how the federal system will probably handle Rule 11 in the future. Even if the United States Supreme Court and Congress do not adopt all these changes, it is my opinion that these changes are good and should be considered by our courts in the implementation of our Litigation Accountability Act, which, to some extent, parallels Rule 11."
Opinion at 420.
I have examined the proposed amendments and comments. It is my personal opinion that the requirements placed on trial judges in imposing sanctions under the Alabama Litigation Accountability Act, as interpreted in Part II of this opinion, are just as stringent as, if not more stringent than, those placed on federal judges by the proposed amendments to federal Rule 11.
Furthermore, I do not believe that Alabama judges have used or will use the provisions of the Litigation Accountability Act to chill attorney creativity or to deny a party an opportunity to present a meritorious claim or defense. Part II of this opinion cautions trial judges to be "exceedingly careful" in imposing sanctions.
I have always believed that there is some merit in having Alabama civil procedure substantially parallel the procedure in the federal courts. As I see it, the legislature intended the Litigation Accountability Act to accomplish the same goals as federal Rule 11. The Litigation Accountability Act, as interpreted in Part II of this opinion, already contains as many safeguards against sanctions as do the proposed amendments to federal Rule 11, or perhaps more, especially insofar as appellate review is concerned.
Justice Adams discusses what has happened in the federal system and what is being proposed to correct it. I do not believe that abuse of the same kind or to the same degree is occurring or will occur in Alabama, and I believe that the safeguards of the Litigation Accountability Act are as good as, if not better than, those proposed for the federal system.
I see no need to say that we should adopt the federal amendments. Our interpretation of the Act accomplishes the same goals and more.
[9] This committee is chaired by the Honorable Sam C. Pointer, presiding judge of the United States District Court for the Northern District of Alabama. Public hearings have been held throughout the country on these changes over the past two years, and these changes are due to go before the United States Supreme Court for its actions prior to their transmission to Congress.